THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* GILBERT MICHAEL LYPKA, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ROBERT ANDREW LYPKA, Appellant.

Fourth Department, October 31, 1973.

*O'Connor, McHugh, Sovocool, Sovocool & Pfann (Matthew F. McHugh* of counsel), for appellants.

*John J. Nicit, District Attorney,* for respondent.

SIMONS, J. The defendants were originally charged with several felony counts involving possession of dangerous weapons, drugs and burglary tools. After their motion to suppress certain evidence was denied, each pleaded guilty to one count of unlawful possession of a dangerous weapon (Penal Law, § 265.05) and one count of criminal trespass in the second degree (Penal Law, § 140.15). The only issue is the constitutionality of a warrantless search of defendants' vehicles.

At about 10:30 P.M. on June 16, 1972 Undersheriff Brewer received a call in the Village of Interlaken, New York, from a detective in Lancaster, Pennsylvania, advising him that it was believed that defendants had recently left Lancaster driving towards their parents' home in Interlaken. Brewer was told that one defendant was operating a GMC bus of camouflaged color with Alabama registration, pulling a Chevrolet panel truck of camouflaged color in tandem and the other defendant was operating a 1967 Oldsmobile, Pennsylvania registration, pulling a trailer. The Lancaster police gave the Undersheriff a detailed list of stolen motorcycles and weapons[1] believed to be in the vehicles and advised him that the defendants were considered dangerous. The Undersheriff did not have a teletype receiver but a teletype had been sent and received by the State Police and Brewer also contacted them at the Waterloo substation. He ordered one of his deputies to keep the Lypka home on Powell Road in the Town of Covert under surveillance. At about 3:00 A.M. his deputy advised him that defendants had arrived at their parents' home. Brewer secured the assistance of other deputies and the State Police and drove to the Lypka residence at about 3:30 A.M. When they arrived there they found that the house was dark and the vehicles were parked, the GMC bus and truck on the edge of the road and the Oldsmobile and trailer in the driveway. Brewer stationed his men around the farmhouse and then he and Trooper Scaglione knocked at the door. Defendant Robert Lypka came to the door and was advised that the police had information that he and his brother possessed stolen property from Pennsylvania. Brewer and Scaglione asked to look through the vehicles and Robert assented. Gilbert was not present at the time but he was awakened and subsequently helped unlock the vehicles. It was

1. On the list were a .45 automatic pistol, a .25 automatic pistol, a .32 revolver, an M-16 machine gun, and one machete. After search of the vehicles the State Police found, in addition, a pipe, a sawed off .12 gauge shotgun, marijuana, hashish, burglar's tools, a switchblade knife and other knives together with a substantial quantity of ammunition for these guns and a stolen motorcycle. A second stolen motorcycle was found at the Lypka residence.

during this search that two of the guns described, together with a pipe and vegetable material appearing to be marijuana were found in the trunk of the Oldsmobile. The defendants were taken into custody and the vehicles removed to the State Police substation at Waterloo where a thorough search uncovered a stolen motorcycle, and the other weapons and drugs.

The court is in agreement that probable cause for the search at the farmhouse existed (see *United States* v. *Ventresca,* 380 U. S. 102; *People* v. *Glen,* 30 N Y 2d 252, cert. den. 409 U. S. 849; *People* v. *Reisman,* 29 N Y 2d 278; and see, also, *People* v. *Horowitz,* 21 N Y 2d 55, 60). We disagree as to the need for the police to obtain a warrant.

The People contend that the search was conducted with the permission of defendants in that Robert expressly consented to it and Gilbert tacitly consented to it by unlocking the cars. Defendants, on the other hand, urge that having been awakened at 3:30 A.M. and seeing a group of armed police surrounding the house, any consent given by them could hardly be considered voluntary. The trial court found as a fact that the defendants had voluntarily consented to the search (see *Schneckloth* v. *Bustamonte,* 412 U. S. 218). We prefer to base our affirmance on the ground that a warrantless search of these automobiles was justified under the existing exigent circumstances. (*Chambers* v. *Maroney,* 399 U. S. 42; *People* v. *Brown,* 28 N Y 2d 282.)

At the time Undersheriff Brewer received notice of defendants' departure from Pennsylvania they were not actually in New York State or in his jurisdiction. It was then 10:30 P.M. and defendants were 300 miles away. The police could only speculate whether they might or might not be headed for their parents' home or the rural area around the Village of Interlaken. In a super abundance of caution, the Undersheriff might have tried to obtain a prospective search warrant if he was aware of the legal possibility of obtaining one.[2] On the other hand he could, as he did, wait to see if defendants were coming to Interlaken or traveling somewhere else. Certainly it was not unreasonable at that hour of the night to forego obtaining a warrant until it was determined that defendants had arrived in the area. When the Sheriff was notified at 3:00 A.M. that the vehicles and the defendants were at the Lypka residence, he had

---

2. In *People* v. *Glen* (30 N Y 2d 252, cert. den. 409 U. S. 849) (decided 3 months before this incident) the Court of Appeals announced the principle that police officers could obtain a search warrant prospectively for articles expected but not yet received on the premises or by the person to be searched.

a choice of moving in and searching the vehicles or posting a guard over them until a search warrant could be obtained. He could effect a warrantless search or a warrantless seizure, although either is obnoxious under the Constitution if not justified by the circumstances (see *Chambers* v. *Maroney, supra,* p. 52; *People* v. *Brosnan,* 32 N Y 2d 254, 260). Certainly, however, he could not justify ignoring the danger inherent in the situation until a warrant was obtained. It is suggested that short of posting a guard over the vehicles, the house and vehicles could be kept under surveillance without an actual seizure until a warrant was obtained. But as the Supreme Court has said, " The fact that the protection of the public might, in the abstract, have been accomplished by ' less intrusive ' means does not, by itself, render the search unreasonable." (*Cady* v. *Dombrowski,* 413 U. S. 433, 447.) Furthermore, the distinction between surveillance and seizure becomes narrow indeed when it is clear that in the interest of public safety any surveillance must ultimately result in restraint by the police if an attempt were made by defendants to remove the vehicles with loaded dangerous weapons.

Finally, it is contended that there was no immediacy requiring a search because these vehicles were secured for the night (see *Coolidge* v. *New Hampshire,* 403 U. S. 443). In *Coolidge* the Supreme Court held that the automobile exception to the Fourth Amendment was irrelevant when there is no reasonable likelihood that the automobile may be moved. But here all that was needed to " unsecure " the cars was use of the ignition keys possessed by defendants, a relatively simple act which could destroy any opportunity for police control of the situation. Furthermore the circumstances here are vastly distinguishable from the facts in *Coolidge.* In *Coolidge* police thought that they had a valid search warrant at the time they seized the car (the Supreme Court held otherwise). The car was seized while parked in the driveway of the defendant's home some weeks after the murder, at a time when defendant was in custody, his wife was being escorted by police officers to the home of a relative in another town and two police officers had been stationed to guard the defendant's home. There was no suspected accomplice to the crime[3] and not the remotest expectation

3. The defendants' witnesses in this case testified at the suppression hearing that on the night of the search the police officers stated they had received word that there were 20 or 25 people involved with the defendants. The prosecution did not urge that fact as justification for the warrantless search.

that the car would be removed or any evidence destroyed. The purpose of the search was not to find and secure dangerous weapons but to vacuum clean the car for hair and fabric samples, a procedure accomplished over a period of months.

In *Cady* v. *Dombrowski* (*supra*) the Supreme Court approved a warrantless search of defendant's automobile to locate a gun after it had been removed by the police to a private garage. At the time the defendant was in jail, but the court held that the search was a necessary police procedure to protect the public from harm which might result if the weapon was found by an intruder. We think the same principle applies here. The judgments should be affirmed.

CARDAMONE, J. (dissenting). One central issue is presented for determination on this appeal: whether the presence of probable cause to believe that weapons and contraband are in the possession of known persons will permit a warrantless search of vehicles owned by said persons on the facts and circumstances revealed in this record.

At approximately 10:30 P.M. on June 16, 1972 the Seneca County Sheriff's Department received a telephone message from the Lancaster, Pennsylvania Police advising that the defendants, Gilbert and Robert Lypka, were believed to be en route from Pennsylvania to their parents' home in Seneca County, New York, and had in their possession stolen property and they were armed. This communication and a teletype message received by the New York State Police described the vehicles, the weapons and the stolen property. The Undersheriff of Seneca County advised his night patrol to check the Lypka residence. The defendants arrived home at 1:00 A.M. on June 17, 1972. The vehicles, consisting of a GMC bus pulling a Chevrolet panel truck and a 1967 Oldsmobile with a U-Haul trailer attached, were parked in front of the parents' home and the defendants and the household retired for the night. At about 3:00 A.M. the Undersheriff was advised by the night patrol that the defendants were home. Thereafter, at about 3:30 A.M. the Undersheriff together with six or seven deputies and several State troopers armed with shotguns and a rifle as well as their regulation handguns went to the Lypka residence. None of the police officers had obtained search or arrest warrants. Two of the officers knocked on the door, while the others positioned themselves about the house. When the defendants were awakened, the defendant Robert Lypka was asked about the stolen property and, upon his denial of any knowledge concerning it, was told by the police that they wanted to look through all the vehicles.

The police testified that the defendant Robert Lypka consented to the search. Both defendants testified, as did their parents, that they observed the armed police officers through the windows of their house and believed that they had no choice but to comply with the officers' request to search. As a result of the search at the Lypka residence contraband and weapons were found. A subsequent and more thorough search of the then impounded vehicles at the New York State Police barracks disclosed more weapons and some of the stolen property described by the Pennsylvania police. Defendants were thereafter indicted on a number of felony counts. Their motion to suppress all the evidence obtained during the search was denied following a hearing and both defendants pled guilty to unlawful possession of a weapon, a felony, and criminal trespass in the second degree, a misdemeanor.

As noted by the majority, there is no disagreement that the police had probable cause to believe that the defendants Gilbert and Robert Lypka were in possession of stolen goods and weapons. (*United States* v. *Ventresca,* 380 U. S. 102; *Brinegar* v. *United States,* 338 U. S. 160.) However, the presence of probable cause alone does not serve to obviate the necessity for procuring a search warrant in this case.

It has been recognized that not all warrantless searches of private property are per se " unreasonable " under the Fourth Amendment. Certain well-established and narrowly drawn exceptions have been upheld limiting the general requirement that a warrant must be obtained before a search will be permitted. (See, e.g., *Katz* v. *United States,* 389 U. S. 347; *Ker* v. *California,* 374 U. S. 23; *United States* v. *Rabinowitz,* 339 U. S. 56; *Warden* v. *Hayden,* 387 U. S. 294; *Terry* v. *Ohio,* 392 U. S. 1.) It has been respondent's contention throughout these proceedings that the warrantless search in this case was proper under two of these established exceptions; i.e., that the defendants consented to the searches, and that the search was justified under the " automobile exception " to the Fourth Amendment. A majority of this court have agreed with these contentions and upheld the instant search. I respectfully dissent.

Consent to search is a constitutionally permissible method of avoiding the warrant requirement of the Fourth Amendment (*Zap* v. *United States,* 328 U. S. 624; *Katz* v. *United States,* 389 U. S. 347; *Vale* v. *Louisiana,* 399 U. S. 30). While the majority do not specifically rely on this ground to sustain the instant search and seizure, the intimation is clear that but for their reliance on the so-called " automobile exception ", the court

would have found consent to search based upon the totality of circumstances presented by the evidence (cf. *Schneckloth* v. *Bustamonte,* 412 U. S. 218).

I cannot agree with this view of the evidence. When a prosecutor seeks to rely upon consent to justify the lawfulness of a search he has the burden of proving that the consent was in fact, freely and voluntarily given (*Bumper* v. *North Carolina,* 391 U. S. 543; *Amos* v. *United States,* 255 U. S. 313). This court has held that searches by consent are looked upon with great suspicion (*People* v. *Stepps,* 31 A D 2d 59). "This is particularly true when the circumstances are such as to suggest coercion and where it is difficult to understand why a defendant, assuming he had knowledge of the presence of the weapon in the automobile, would freely consent to the search." (p. 62.) Here the presence of approximately eight or nine armed police officers at 3:30 A.M. is a situation so "instinct with coercion" (*Amos* v. *United States, supra*) that acquiescence in the "request" of the officers to search cannot be considered consent "freely and voluntarily given" (*Bumper* v. *North Carolina, supra*; *Perkins* v. *Henderson,* 418 F. 2d 441). Therefore, in order to be valid the instant warrantless search and seizure must be sustained on some other ground.

To this end, the majority hold that the facts of this case created a situation where the "exigencies" of the moment made it impossible for the police authorities to obtain a warrant prior to searching the defendants' motor vehicles and that such exigencies were sufficient to sustain a warrantless search. The justification for this view can only be based upon the so-called "automobile exception" to the Fourth Amendment prohibition against unreasonable searches and seizures. In *Carroll* v. *United States* (267 U. S. 132), the United States Supreme Court established the principle that where an officer has reasonable or probable cause to believe that an automobile or other vehicle contains contraband goods which are being illegally transported, a search of said vehicle will be sustained even where a warrant has not been previously obtained. Recently the Supreme Court has had occasion to review the viability of that principle in *Coolidge* v. *New Hampshire* (403 U. S. 443). While the facts of that case are distinguishable from those considered here, the underlying rationale is quite applicable. That is, that there is "'a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon, or automobile, for contraband goods, where *it is*

*not practicable to secure a warrant* because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' 267 U. S. at 153.'' (403 U. S. 443, 459–460.)

Likewise, as was said in *Chambers* v. *Maroney* (399 U. S. 42), '' exigent circumstances '' justify the warrantless search of '' an automobile stopped on the highway '' where there is probable cause because the car is '' movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.'' In other words, where '' the opportunity to search is fleeting.'' (p. 51).

The undisputed evidence adduced at the suppression hearing clearly showed that the New York police authorities became aware of the defendants' intended return to their parents' home at 10:30 o'clock in the evening, some five hours prior to the time that the search took place. The information which both the New York State Police and the local Sheriff's Department received was detailed, specific and accurate. Not only did it describe the defendants by name but it also described the exact nature of the contraband alleged to be stolen, the weapons allegedly in their possession and the license plate numbers and a description of the vehicles they were driving. It is this information which serves as the basis for the finding of probable cause herein and which also should have been used by the New York police authorities to obtain a prospective warrant to search the vehicles upon their entrance into this State (*People* v. *Glen,* 30 N Y 2d 252, cert. den. 409 U. S. 849). The majority assert that at the 3:30 A.M. hour when the search actually occurred it would have then been impractical to obtain a warrant. However, this results only because of the failure of the proper authorities to secure a warrant when they had an opportunity to do so. Moreover, the majority adopt, without any proof in the record to support such conclusion, the view that a warrant could not practicably be obtained because of the lateness of the hour and the rural location of the defendants' residence. Further, the burden of proof is placed upon the prosecution to establish by clear and convincing evidence that it was indeed impracticable to obtain such a warrant. (Cf. *Hernandez* v. *United States,* 353 F. 2d 624; *United States* v. *Payne,* 429 F. 2d 169.) Thus the scope of warrantless searches of automobiles and other movable vehicles is tightly drawn. Not only must there be probable cause to believe that contraband is being illegally transported but there must also be no practicable way either safely to secure the goods or to obtain a warrant before

a warrantless search will be upheld. Even though probable cause concededly exists here, the record is utterly devoid of proof which would show either no practicable way safely to secure the contraband or that a search warrant could not timely be obtained. It is this failure in the proof which, in my view, is fatal to the People's case and mandates suppression of the evidence seized.

The majority cite *Cady* v. *Dombrowski* (413 U. S. 413) which is clearly distinguishable. That case upheld a warrantless search by a police officer of a trunk of an automobile, which was already in the custody and control of the authorities after a one-car accident, in order to obtain a service revolver which they (police) had reason to believe was located there. The Supreme Court clearly based its opinion on the grounds that the police were performing a " caretaker" function of protecting the public by taking possession of a weapon which they thought was located in the trunk of an unguarded automobile. In the instant case the police were not performing any such caretaker function but rather were routinely investigating a report that a crime had occurred and the defendants were probably in possession of stolen goods and were armed. A warrantless search in such a situation cannot be sustained unless one of the established exceptions to the Fourth Amendment is applicable. No such exception exists here.

GOLDMAN, P. J., WITMER and HENRY, JJ., concur with SIMONS, J.; CARDAMONE, J., dissents and votes to reverse the judgments and grant the motions to suppress, in an opinion.

Judgments affirmed.