ACCEPTED
13-14-00682-CR
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
2/18/2015 9:20:22 AM
DORIAN RAMIREZ
CLERK

**No. 13-14-682-CR**

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
2/18/2015 9:20:22 AM
DORIAN E. RAMIREZ
Clerk

IN THE COURT OF APPEALS
FOR THE THIRTEENTH DISTRICT OF TEXAS
AT CORPUS CHRISTI

**THE STATE OF TEXAS,
APPELLANT**

**v.**

**JEROME EDMOND,
APPELLEE.**

ON APPEAL FROM THE 105TH DISTRICT COURT
NUECES COUNTY, TEXAS

**APPELLANT'S BRIEF
(STATE'S APPEAL)**

Michelle A. Putman
State Bar No. 24068493
Assistant District Attorney
105th Judicial District of Texas
901 Leopard, Room 206
Corpus Christi, Texas 78401
(361) 888-0410
(361) 888-0399 (fax)
michelle.putman@nuecesco.com

Attorney for Appellant

**ORAL ARGUMENT IS REQUESTED**

## IDENTITY OF PARTIES AND ATTORNEYS

State's Trial Attorney:
    Michelle A. Putman
    State Bar No. 24068493
    Assistant District Attorney
    901 Leopard, Room 206
    Corpus Christi, Texas 78401
    (361) 888-0410
    (361) 888-0399 (fax)
    michelle.putman@nuecesco.com

State's Appellate Attorney:
    Michelle A. Putman
    State Bar No. 24068493
    Assistant District Attorney
    901 Leopard, Room 206
    Corpus Christi, Texas 78401
    (361) 888-0410
    (361) 888-0399 (fax)
    michelle.putman@nuecesco.com

Appellee:
    Jerome Edmond
    921 Red Start Cir.
    Corpus Christi, Texas 78418
    361-533-6135

Appellee's Trial & Appellate Attorney:
    Scott Ellison
    State Bar No. 00787432
    410 Peoples Street
    Corpus Christi, Texas 78401
    (361) 887-7600
    scottellison@att.net

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND ATTORNEYS ……………….………..2

INDEX OF AUTHORITIES . . . ………………………………………..5

STATEMENT OF THE CASE ……………………………………………8

ISSUE PRESENTED……………………………………………………9

SUMMARY OF THE ARGUMENT . . . …………………….……………10

STATEMENT OF FACTS…………………………………………………12

ARGUMENT

**(1) Whether the Corpus Christi Police Department's Officer Robert Mayorga's seizure of appellant's blood under Texas Transportation Code section 724.012(b)(3), Texas's mandatory blood draw statute, was constitutional as applied under the Fourth Amendment as interpreted by** *McNeely v. Missouri*...................................................................... 13

**I. THE TEXAS IMPLIED CONSENT / MANDATORY DRAW STATUTE.**................................................................................ 13
**II. THE** *McNEELY* **CASE.** .......................................................... 16
**III. RECOGNIZED EXCEPTIONS TO THE WARRANT REQUIREMENT.** ........................................................................ 19
    **A. Actual Consent**……………………………………………….20
    **B. Exigent Circumstances**…………………………………..20
    **C. The Automobile Exception.**........................................... 22
    **D. Consent and Waiver.**...................................................... 24
    **E. Search Incident to Arrest.**............................................. 27
**IV. OTHER SIGNIFICANT FACTORS.** ..................................... 28
    **A. Legitimate Governmental Interest.** .............................. 28
    **B. Gravity of the Offense.**.................................................. 29
    **C. Bright-Line Rule.**........................................................... 29
    **D. Presumption of Validity and Constitutionality.** ............. 30
    **E. The Underlying Expectation of Privacy.**........................ 30
    **F. The Specific Context of a Post-Arrest Mandatory Draw.**32

**G. Statutory Protections Concerning the Manner of Drawing Blood.**........................................................... 32

**V. OTHER CASES.**................................................................... 34

**VI. THE UNIQUE NATURE OF THE INTRUSION – SEARCH OR SEIZURE?**............................................. 35

**VII. CONCLUSION.**................................................................. 38

PRAYER . . . ……………………………………………………38

CERTIFICATE OF SERVICE . . . …………………………………………...40

# INDEX OF AUTHORITIES

## Cases

*Aliff v. State*, 627 S.W.2d 166, 169-170 (Tex. Crim. App. 1982)………….20

*Arizona v. Gant*, 556 U.S. 332 (2009). ......................................................... 27

*Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536 (2001)........... 36

*Aviles v. State*, 385 S.W.3d 110 (Tex. App.—San Antonio 2012, pet ref'd).35

*Beeman v. State*, 86 S.W.3d 613 (Tex. Crim. App. 2002). .................... 15, 16

*United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593 (1972). .................... 25

*Breithaupt v. Abram*, 352 U.S. 432 (1957).................................................... 32

*California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066 (1985). ................. 22, 23

*Carpenter v. Gage*, 686 F.3d 644 (8th Cir. 2012). ....................................... 37

*Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280 (1925). ................ 22, 23

*City of Ontario v. Quon*, 130 S.Ct. 2619 (2010). ......................................... 31

*Cook v. City of Bella Villa*, 582 F.3d 840 (8th Cir. 2009)............................ 37

*Cupp v. Murphy*, 412 U.S. 291 (1973). ................................................. 27, 37

*Douds v. State*, --- S.W.3d ----, No. 14–12–00642–CR, 2013 WL 5629818 (Tex. App.--Houston [14th Dist.], October 15, 2013, no pet. h.). ................ 35

*Dunaway v. New York*, 442 U.S. 200 (1979)................................................. 29

*United States v. Edwards*, 415 U.S. 800 (1973). .......................................... 28

*State v. Flonnory*, 2013 WL 3327526 (Del. Super. Ct., June 12, 2013). ..... 35

*In re Hart*, 2013 WL 2990658 (Wis. App., June 18, 2013). ........................ 35

*Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301 (1990). ....................... 36

*Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946 (2001). ......................... 19

*United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652 (1984). ............... 36

*Karenev v. State*, 281 S.W.3d 428 (Tex. Crim. App. 2009). ........................ 30

*United States v. Knights*, 534 U.S. 112 (2001). ........................................... 25

*Life & Casualty Ins. Co. v. McCray*, 291 U.S. 566, 54 S.Ct. 482 (1934). ... 30

*Maryland v. King*, 133 S.Ct. 1958 (2013). ........................................ 28, 34, 37

*Meekins v. State*, 340 S.W.3d 454 (Tex. Crim. App. 2011). ........................ 24

*Missouri v. McNeely*, 569 U.S. ___, 133 S.Ct. 1552 (2013). .... 16, 17, 18, 19, 21, 27, 29, 36

*State v. Mosely*, 348 S.W. 3d 435, 440 (Tex. App.-Austin 2011, pet ref'd).20

*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012). ...................................... 37

*State v. Osborne*, 2013 WL 3213298 (Wis. App., June 27, 2013). .............. 35

*State v. Powell*, 306 S.W.3d 761 (Tex. Crim. App. 2010). .......................... 36

*Reeder v. State*, --- S.W.3d ----, No. 06–13–00126–CR, 2014 WL 60162 (Tex. App.--Texarkana, January 8, 2014). ................................................ 34

*Sampson v. California*, 547 U.S. 843 (2006)................................................ 25

*Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826 (1966).. 20, 27, 32, 33, 34, 36

*Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041 (1973). ......... 20, 24

*South Dakota v. Neville*, 459 U.S. 553 (1983). ........................................... 32

*State v. Villarreal*, No. 13-13-00253-CR (Tex. App.—Corpus Christi Jan. 23, 2014). ................................................................ 15, 35

*Welsh v. Wisconsin*, 466 U.S. 740 (1984). ................................................. 29

*Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297 (1999). .................... 28

*Zap v. United States,* 328 U.S. 624, 66 S.Ct. 1277 (1946). .......................... 25

## Statutes & Rules

Tex. Code Crim. Proc. art. 18.01. ................................................................. 15

Tex. Transp. Code § 724.011 ......................................................................... 14

Tex. Transp. Code § 724.012 .................................................................... 14, 18

Tex. Transp. Code § 724.013 .................................................................... 14, 18

Tex. Transp. Code § 724.016 ......................................................................... 14

Tex. Transp. Code § 724.017. ……………………………………………14, 33

## STATEMENT OF THE CASE

Defendant Jerome Edmond was charged by indictment in Cause 13-CR-0895-D with the third degree felony offense of Driving While Intoxicated, Third Offense or More alleged to have been committed on or about March 20, 2013 in Nueces County, Texas. Edmond was represented by his attorney, Scott Ellison throughout all proceedings, and Mr. Ellison continues to represent Edmond in this Court. On April 4, 2014, the State and defendant presented evidence and argument on Defendant's Motion to Suppress. The sole issue on the motion to suppress was whether or not *McNeely v. Missouri* required a warrant for the officer to perform the blood draw.

The Court suppressed the results from the warrantless blood draw law that Corpus Christi Police Officer Robert Mayorga obtained during his investigation of the March 20, 2013 offense of driving while intoxicated, alleged to have been committed by Edmond. On November 18, 2014, the trial court granted Defendant's Motion to Suppress.

**ISSUE PRESENTED**

Whether the Corpus Christi Police Department's Officer Robert Mayorga's seizure of appellant's blood under Texas Transportation Code section 724.012(b)(3), Texas's mandatory blood draw statute, was constitutional as applied under the Fourth Amendment as interpreted by *McNeely v. Missouri*?

## SUMMARY OF THE ARGUMENT

The trial court abused its discretion when it suppressed the results of the warrantless blood draw of defendant's blood. The State argues that the opinion issued by the United States Supreme Court in *McNeely v. Missouri* does not stand for the proposition that all warrantless blood draws in driving while intoxicated (hereinafter "DWI") offense are unconstitutional absent a warrant, and, accordingly, the Texas mandatory blood draw statute encompassed in Transportation Code Section 724.012. In *Villarreal v. State*, the Texas Court of Criminal Appeals has presently ruled that a warrant is required; however, the State in that case has a motion for rehearing on file that has yet to be ruled upon.

The State further would have the Court find that in situations where a defendant, such as in this case, initially confers consent for a blood draw, withdraws it, then subsequently confers consent again, the defendant has actually consented to the blood draw.

Additionally, the State argues that the defendant created an exigent circumstance because he initially conferred consent for the blood draw. Only upon arrival at the hospital did he say he withdrew consent. The officer relied on the defendant's consent, all the way up until the actual blood draw,

time he could have spent getting a warrant, only to have it withdrawn right as the blood was about to be drawn. This created an exigent circumstance.

This case can be distinguished from Villarreal and other McNeely type cases in that the defendant ended up actually consenting and created an exigent circumstance by allowing the officer to detrimentally rely on the defendant's consent only to have it withdrawn at the last moment.

## STATEMENT OF FACTS

At the hearing of Defendant's Motion to Suppress testimony provided the following facts : (1) Officer Robert Mayorga was called out to investigate a possible intoxicated driver, Jerome Edmond at approximately 2:00/2:20 a.m.; (2) Edmond initially agreed to perform field sobriety tests, but then refused to complete them; (3) Officer Mayorga read Edmond his rights in the DIC-24 form and requested a sample of Edmond's blood at approximately 3:08 a.m.; (4) Edmond agreed to provide a sample of his blood at that time; (5) Officer Mayorga did not have a blood kit on him, so he had to wait for his supervisor to arrive with a blood kit; (6) Officer Mayorga then transported the defendant to the hospital to perform the blood draw; (7) Defendant's blood was drawn at approximately 3:40 a.m.; (8) During the transport to the hospital, Officer Mayorga was not working on obtaining a warrant because Edmond consented to the blood draw; (9) Right as defendant's blood was to be drawn, he withdrew consent; (10) Officer Mayorga read the defendant the DIC-24 again, and the defendant refused; (11) Officer Mayorga had the defendant's blood drawn anyways because he had two previous DWI convitions; (12) During transport back to the detention center, defendant tells Officer Mayorga that he never said no, he agreed to the blood draw.

NO. 13-14-682-CR

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | COURT OF APPEALS |
| Appellant, | § | |
| | § | |
| V. | § | FOR THE THIRTEENTH |
| | § | |
| JERMONE EDMOND | § | |
| Appellee. | § | DISTRICT OF TEXAS |

## APPELLANT'S BRIEF
## (STATE'S APPEAL)

Comes now the State of Texas, by and through the District Attorney for the 105th Judicial District of Texas, and files this Second Supplemental Brief in compliance with this Court's February 13, 2014, order for briefing, and would show the Court the following:

(1) **Whether the Corpus Christi Police Department's Officer Robert Mayorga's seizure of appellant's blood under Texas Transportation Code section 724.012(b)(3), Texas's mandatory blood draw statute, was constitutional as applied under the Fourth Amendment as interpreted by *McNeely v. Missouri.***

## I. THE TEXAS IMPLIED CONSENT/MANDATORY DRAW

## STATUTE.

Driving on a roadway is a privilege, not a right; by doing so, a defendant impliedly consents to providing a breath or blood sample when suspected of intoxication-related crimes. The Transportation Code provides as follows:

13

> If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place, or a watercraft, while intoxicated, or an offense under Section 106.041, Alcoholic Beverage Code, ***the person is deemed to have consented***, subject to this chapter, to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration or the presence in the person's body of a controlled substance, drug, dangerous drug, or other substance.

Tex. Transp. Code § 724.011 (emphasis added). A person retains the right under most routine circumstances, subject to an automatic license suspension, to refuse to provide a specimen. Tex. Transp. Code § 724.013. However, the Legislature extinguished a defendant's right to refuse in cases where an officer possesses probable cause to believe that certain enumerated, egregious circumstances existed. *Id.* at § 724.012(b).[1] In those narrow instances, the Transportation Code requires the arresting officer to "require the taking of a specimen of the person's breath or blood." *See* Tex. Transp. Code § 724.012(b). The Transportation Code then provides for the breath or blood specimen to be taken "at the request or order of" the officer in question. *See* Tex. Transp. Code § 724.016 (a) & § 724.017 (a). The specimen is taken purely under the authority of the statute.

---

1 Transportation Code Sections 724.012(b)(1)(A)-(b)(1)(C) require mandatory draws when the offense caused death, serious bodily injury, or an injury requiring transport to a medical facility for care, while Section (b)(2) requires a mandatory draw when the intoxicated driver was carrying a child passenger under fifteen years of age, and Section (b)(3) requires a mandatory draw for a recidivistic DWI offender. See generally Tex. Transp. Code § 724.012(b).

By contrast, a search warrant is defined in the Code of Criminal Procedure as "a written order, issued by a magistrate and directed to a peace officer, commanding him to search for any property or thing and to seize the same and bring it before such magistrate." *See* Tex. Code Crim. Proc. art. 18.01 (a). The arresting officer has no authority to require a magistrate to issue a warrant, but only to provide information to that magistrate in the hope of securing a warrant. If the magistrate signs a warrant, the arresting officer, or any other officer into whose hands the warrant comes, then acts under the authority of the magistrate's warrant and not the statutory directive.

Accordingly, the two are collateral sources of authority which may not be merged into one, contrary to 13th Court of Appeals' suggestion in *State v. Villarreal*, No. 13-13-00253-CR (Tex. App.—Corpus Christi Jan. 23, 2014).

The Court of Criminal Appeals endorsed this distinction when it recognized the taking of a blood specimen under the implied consent statute as "another method of conducting a constitutionally valid search," *Beeman v. State*, 86 S.W.3d 613, 615 (Tex. Crim. App. 2002), and stated that:

> The implied consent law expands on the State's search capabilities by providing a framework for drawing DWI suspects' blood *in the absence of a search warrant*. It gives officers an additional weapon in their investigative arsenal,

enabling them to draw blood in certain limited circumstances *even without a search warrant*.

*Id.* at 616. (emphasis added).

## II. THE *McNEELY* CASE.

The Supreme Court's *McNeely* decision focused on the narrow question of "whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving questions." *McNeely*, 133 S.Ct. at 1556. The five-vote majority reversed the warrantless seizure in *McNeely*, holding that the State may not rely on a *per se* exigency premised solely on the natural dissipation of alcohol from the bloodstream. *Id.* at 1568.[2] However, the Court made the limited nature of its holding apparent: "Because this case was argued on the broad proposition that drunk-driving cases present a *per se* exigency, the arguments and the record do not provide the Court with an adequate analytic framework for a detailed discussion of all the relevant factors that can be taken into account in determining the reasonableness of acting without a warrant." *Id.* at 1566-57.

---

[2] Missouri has an implied-consent statute, as do all fifty states. *See, e.g.,* Mo. Ann. Stat. §§ 577.020.1, 577.041; *see also McNeely*, 133 S.Ct. at 1566 (*citing* National Highway Traffic Safety Administration [NHTSA], Alcohol and Highway Safety: A Review of the State of Knowledge 167 (No. 811374, Mar. 2011) [NHTSA Review]). Yet, the Missouri prosecutors did not rely on their State's implied-consent statute or, for that matter, any other exception to the Fourth Amendment's warrant preference.

*McNeely's* disposition resulted in four separate opinions, including the 5-4 majority by Justice Sotomayor. However, only part of her decision garnered a majority; Justice Kennedy did not join in the last part of Section II, nor did he join Section III. Justice Kennedy's separate concurrence signaled – in express language – that the majority only decided the *per se* exigency issue on which *certiorari* had been granted, and nothing more. *McNeely*, 133 S.Ct. at 1569 (J. Kennedy, concurring in part). Justice Kennedy did not agree with Justice Sotomayor's Section III discussion discounting law enforcement's concerns regarding the need for a bright-line rule, nor did he join in the remaining plurality's minimization of the government's interest in preventing and prosecuting drunk-driving offenses. *Id.* at 1564-67 (Part III). While five justices voted against a *per se* application of exigency, all of the justices recognized some blood draws will be compelled, and there appears to be a differently-constituted-five-vote block that remains open to a modified rule departing from the warrant requirement in circumstances other than a *per se* blood-alcohol exigency. *See id.* at 1568-77 (J. Kennedy, concurring; Chief Justice Roberts, concurring and dissenting, joined by Justices Breyer and Alito; and Justice Thomas, dissenting).

Moreover, the *McNeely* opinions contain positive references to the implied-consent provisions enacted across this country. Part III of Justice Sotomayor's opinion, for instance, stated:

> States have a broad range of legal tools to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws. ***For example, all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense***. See NHTSA Review 173; supra, at 1556 (describing Missouri's implied consent law).

*McNeely*, 133 S.Ct. at 1566 (emphasis added). The opinion continues by recognizing the "significant restrictions" States have placed on when an officer may obtain a compelled sample. *See McNeely*, 133 S.Ct. at 1566 n.9 (listing mandatory-draw provisions countrywide as an example of how states have placed "significant restrictions" on when officers may obtain compelled samples). The Court even cites Texas' mandatory blood-draw statute. *Id. at* n.9 *citing* Tex. Transp. Code §§ 724.012(b), 724.013. Moreover, Justice Kennedy, who provided the crucial fifth vote in *McNeely*, states in his concurrence that States "can adopt rules, procedures, and protocols that meet the reasonableness requirements of the Fourth Amendment and give helpful guidance to law enforcement officials." *Id.* at 1569. These opinions in no way disapproved of the States' carefully

tailored implied consent schemes where only specified and limited situations authorized compelled blood draws after refusal. *See id.* at 1566 & n.9.

In addition, the language in each of the *McNeely* opinions, including the majority, assumes the gravity of the dangers faced by the traveling public due to intoxicated drivers. For example, the majority asserts as follows:

> ***"No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it."*** *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). Certainly we do not. While some progress has been made, drunk driving continues to exact a terrible toll on our society. *See* NHTSA, Traffic Safety Facts, 2011 Data 1 (No. 811700, Dec. 2012) (reporting that 9,878 people were killed in alcohol-impaired driving crashes in 2011, an average of one fatality every 53 minutes).

*McNeely,* 133 S.Ct. at 1565 (emphasis added). Nothing in any of the various *McNeely* opinions signals that any member of the Supreme Court would look unfavorably on implied consent provisions.

## III. RECOGNIZED EXCEPTIONS TO THE WARRANT REQUIREMENT.

In addition to exigent circumstances, the Supreme Court recognizes that there are exceptions to the warrant requirement, such that "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or

individual, circumstances may render a warrantless search or seizure reasonable." *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946 (2001).

## A. Actual Consent

The law is well settled that actual consent to a search is an exception to the warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854 (1973). Defendant initially consented to the blood draw, but then withdrew that consent at the hospital. However, after the blood was drawn and defendant was transported to the detention center, he stated that he did agree to the blood draw, thereby conferring consent again. Consequently, defendant was waived his argument that he did not provide actual consent.

## B. Exigent Circumstances

Warrantless blood draws are constitutional where "officers have probable cause to arrest a suspect, exigent circumstances exist, and a reasonable method of extraction is available." *State v. Mosely*, 348 S.W. 3d 435, 440 (Tex. App.-Austin 2011, pet ref'd) (citing *Schmerber v. California*, 384 U.S. 757, 767-68, 86 S.Ct. 1826, (1966)); *Aliff v. State*, 627 S.W.2d 166, 169-170 (Tex. Crim. App. 1982).

In the instant case, officers had probable cause to arrest defendant, and a blood draw is a reasonable method of extraction. Additionally, exigent

circumstances existed due to defendant's withdrawal of his consent to the blood draw at the hospital. Officer Mayorga had to take time to wait for his supervisor to arrive with an extra blood kit, took time to transport the defendant to the hospital, only to have the defendant right as the blood draw is about to begin withdraw consent.

In *McNeely*, the Supreme Court recognized that "some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test." *McNeely*, 133 S.Ct. at 1561. Here, defendant provided consent to the blood draw at the scene of his arrest. Once transported to the hospital and again read the DIC-24, defendant withdrew his consent. During the time it took to transport defendant to the hospital, officers could have used that time to obtain a warrant. However, the officers relied on defendant's consent and did not obtain a warrant. Only once the time had passed to get defendant to the hospital did defendant withdraw his consent. Having to get a warrant at the point would just further delay the blood draw.

This is an exigent circumstance because those arrested on suspicion of DWI can basically "play the system" and provide verbal consent on the scene of their arrest, causing officers to rely on it, knowing they will

withdraw that consent by the time they get to a hospital in the hopes that the alcohol in their bloodstream will dissipate to below a .08. Officers will have lost valuable time to obtain a warrant to for a sample before this dissipation occurs, and thus the destruction of evidence is a real threat, caused only by the officer's reliance on a defendant's verbal consent. Therefore, due to the dissipation of alcohol in the bloodstream over time, and the officers' reliance on defendant's verbal consent at the scene, exigent circumstances existed to obtain a sample of defendant's blood without a warrant, as anticipated in *McNeely*.

## C. The Automobile Exception.

The automobile exception to the warrant requirement, first set out in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280 (1925) and later repeated in numerous cases including *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066 (1985), recognized that, although the privacy interests in an automobile are constitutionally protected, its ready mobility and capacity to be "quickly moved" justifies a lesser degree of protection, noting also that there had been a long-recognized distinction between stationary structures and vehicles. *Carney*, 471 U.S. at 390. The Court in *Carney* recognized that the reduced expectations of privacy that justify the automobile exception

also derive from "the pervasive regulation of vehicles capable of traveling on the public highways." 471 U.S. at 392.

When the automobile exception had originally been recognized in *Carroll*, the Supreme Court looked to statutes contemporary with the adoption of the Fourth Amendment which allowed law enforcement officials, without a warrant, "to stop, search, and examine any vehicle, beast, *or person* on which or whom they should suspect [of a violation]." 267 U.S. 151 (quoting Act of March 3, 1815, 3 Stat. 231, 232) (emphasis added).

Arguably, the driver of an automobile in transit is just as mobile as his vehicle, just as subject to pervasive licensure and regulation, and, historically, was subject to search without warrant under the same terms as a vehicle or vessel. Accordingly, the Courts should recognize a driver exception to the warrant requirement coextensive with the vehicle exception.

However, even short of a full-fledged and free-standing exception of this nature, the Courts should allow the States to craft such an exception based both on these considerations, on the substantial public interest in ridding the road of drunk drivers, and on implied consent statutes like the Texas version, which condition the privilege of driving on the acceptance of a warrantless search under very limited circumstances.

As in *Carney*, the driving public is on notice of the lessened degree of privacy protection in matters that concern the safety of the roads on which they drive. They know that their cars can be stopped and searched on probable cause alone; likewise, under common mandatory blood draw statutes, they should know that their blood can be drawn without a warrant, on probable cause of DWI alone, under specified conditions. In both situations, the normal expectation of a warrant yields to common concerns inherent in a highly regulated activity in which the driver freely chooses to engage.

**D. Consent and Waiver.**

Another recognized exception to the warrant requirement is a search conducted with the person's voluntary consent, which may be communicated to law enforcement in a variety of ways, including by words, action, or circumstantial evidence showing implied consent. *Meekins v. State*, 340 S.W.3d 454 (Tex. Crim. App. 2011) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041 (1973)) Such consent must ordinarily be carefully scrutinized for its knowing, intelligent and voluntary character. *See Id.*

However, the Supreme Court has long recognized a parallel exception in the form of a prior waiver of the Fourth Amendment rights to probable

cause and a warrant, as a condition for some benefit extended to the suspect from the State. *Zap v. United States,* 328 U.S. 624, 627-28, 66 S.Ct. 1277 (1946), *vacated on other grounds,* 330 U.S. 800, 67 S.Ct. 857 (1947) (the benefit of doing business as a Navy contractor).[3] The waiver applies, moreover, in spite of the suspect's protest at the time of the search in question. *See Id.* In the same way, acceptance of a license to engage in a pervasively regulated activity may carry with it an obligation to allow statutorily authorized inspections of that activity that would otherwise require a warrant. *See United States v. Biswell*, 406 U.S. 311, 316-17, 92 S.Ct. 1593 (1972) (gun dealer who chose to engage in this pervasively regulated business and to accept a federal license was subject to warrantless inspection of his business records and firearms).

In addition, there is no indication that the Navy contractor in *Zap* actually read, much less consciously understood or knowingly agreed to, the waiver in question. However, unlike the consent exception recognized in

---

[3] Governmental and quasi-governmental bodies often condition the granting of a privilege upon the waiver of certain constitutional rights. The decision to participate in an activity is a prime example of this same give-and-take privilege. See Board of Education v. Earls, 536 U.S. at 828 (no Fourth Amendment violation where school board policy conditioned participation in extracurricular activities on random drug testing). Even in the criminal context, suspicion searches promoting a legitimate government interest pass Fourth Amendment muster based upon an offender's parolee status which invokes statutorily-required conditions agreeing to such searches. Sampson v. California, 547 U.S. 843 (2006); see also United States v. Knights, 534 U.S. 112 (2001) (upholding warrantless search of probationer's apartment where authorized by probation condition). In this context, the Supreme Court has suggested its approval of a bargained-for waiver in holding that "acceptance of a clear and unambiguous search condition 'significantly diminished [the suspect's] reasonable expectation of privacy,' … [such] that petitioner did not have an expectation of privacy that society would recognize as legitimate." Sampson v. California, 547 U.S. 843, 852, 126 S.Ct. 2193 (2006) (quoting United States v. Knights, 534 U.S. 112, 120, 122 S.Ct. 587 (2001)).

*Schneckloth*, which on the one hand is unbargained-for and gratuitous on the part of the waiving party, and on the other is subject to strict scrutiny concerning its knowing and voluntary character, a bargained-for waiver, like any other contractual provision, binds a party even though he neglected to read the clause in question. In other words, unlike bare consent, a waiver acts more like a bargained-for contract that binds a party even though he neglected to read it, and it cannot later be withdrawn. In the case of a mandatory draw statute, which the law presumes the driving public to have read, the driver impliedly agrees ahead of time that, in exchange for the privilege of driving on our roads, he is willing to waive the right to a warrant in these limited circumstances. The deal is sealed when he gets behind the wheel, and it can't later be revoked when he gets caught driving in an impaired condition.

Moreover, implied consent statutes like the one in Texas do not apply to all motorists, but only to objectively impaired ones. Accordingly, there are two components over which the driver has control: (1) the choice to drive a vehicle on Texas roads; (2) in an objectively impaired condition that would create probable cause to believe he is intoxicated. A driver who wishes to avoid the inconvenience of a warrantless search of his or her blood may effectively do so simply by avoiding any alcohol or other drugs that

might tend to impair his driving or lead to probable cause to believe that he is intoxicated. On the other hand, the driver who imbibes enough to raise suspicion rightfully takes his chances and should fairly be held to his waiver.

## E. Search Incident to Arrest.

The blood draw was also valid pursuant to the search-incident-to-arrest exception to the warrant preference, especially in light of the recognized exigency regarding the dissipation of alcohol from the blood. *McNeely*, 133 S.Ct. at 1568 ("in every case the law must be concerned that evidence is being destroyed"). In *Cupp v. Murphy*, the Supreme Court upheld the warrantless search of the defendant's body – obtaining samples from underneath his fingernails – as a search incident to arrest. The officers possessed probable cause to believe the defendant had strangled the victim, and the circumstances also involved a potential exigency. *See Cupp v. Murphy*, 412 U.S. 291, 294-95 (1973) (analogizing the highly evanescent characteristic of the fingernail scrapings to the exigent nature of blood alcohol described in *Schmerber*).[4]

In the search-incident-to-lawful-arrest scenario, a law enforcement officer may conduct a full but reasonable search of a person, unlike the scenario often seen where the search focuses on a vehicle. *See, e.g., Arizona*

---

[4] See Schmerber, 384 U.S. 757.

*v. Gant*, 556 U.S. 332, 338 (2009).  There is no limit on the scope of such a search, other than the Fourth Amendment's core reasonableness requirement.[5]  *See United States v. Edwards*, 415 U.S. 800, 803 n.9 (1973). Here, the nexus between the crime being investigated and the search being sought is beyond dispute.   Additionally, the instant search-incident-to-arrest responds to the need to preserve evidence.

## IV. OTHER SIGNIFICANT FACTORS.

In addition to the specific exceptions into which a mandatory blood draw might fit, a number of factors should be considered in determining the overriding question – is it "reasonable" to allow this sort of warrantless blood draw?

## A. Legitimate Governmental Interest.

The Supreme Court has recently stated, concerning warrantless searches, that the "application of 'traditional standards of reasonableness' requires a court to weigh 'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.'"  *Maryland v. King*, 133 S.Ct. 1958, 1970 (2013) (reasonable to require buccal swab as a legitimate police booking procedure) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297 (1999)).

---

[5] The McNeely majority acknowledged that, unlike the exigent circumstances exception, the traditional warrant exception known as search-incident-to-arrest applies categorically, not requiring a case-by-case

In the present case, the legitimate interests of the State in detering drunk driving is thus a factor to weigh in favor of upholding the present mandatory draw statute.

## B. Gravity of the Offense.

In Welsh v. Wisconsin, the Supreme Court recognized that the Fourth Amendment authorizes common-sense consideration of the gravity of the underlying offense when weighing the existence of an exigency. *Welsh v. Wisconsin*, 466 U.S. 740, 751-52 (1984). According to the Court, a crime's severity should be considered as an "important" or "principal" factor in the exigency calculation. The mandatory-blood draw statute applies this legal theory by authorizing compelled draws only in limited, serious cases involving felony conduct or less-than-minor injuries.

## C. Bright-Line Rule.

By providing a limited number of instances mandating compelled blood draws, the implied-consent framework provides a standard "essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Dunaway v. New York*, 442 U.S. 200, 213–14

analysis. McNeely at 1558 n.3.

(1979) (applying the Fourth Amendment to facts unrelated to the instant scenario).

## D. Presumption of Validity and Constitutionality.

Statutes are presumed constitutional until determined otherwise; challengers to a statute's constitutionality bear the burden of rebutting presumed constitutionality. *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009).

In addition, the Supreme Court has recognized that "[t]he presumption of validity which applies to legislation generally is fortified by acquiescence continued through the years." *Life & Casualty Ins. Co. v. McCray*, 291 U.S. 566, 572, 54 S.Ct. 482 (1934). Implied consent statutes of the present nature have been around in Texas and other states for the past 30 years without any significant challenge to their constitutionality. The fact that these statutes are widely accepted throughout the country and have survived for so long without any such challenge should weigh heavily in favor of a presumption that the mandatory draw is valid, reasonable, and constitutional.

## E. The Underlying Expectation of Privacy.

While a state statute cannot contravene the Fourth Amendment protection and requirements for a warrant, it may both represent and inform the extent of the societal "reasonable expectation of privacy."

The Supreme Court has recognized that the extent to which society recognizes an expectation of privacy in any particular context evolves with changing conditions, and that state statutes themselves may represent and mirror those expectations. *See City of Ontario v. Quon*, 130 S.Ct. 2619, 2629-30 (2010) (city's review of employee's text messages was reasonable, and thus did not violate Fourth Amendment). In addition, clearly communicated policies of someone in authority, such as an employer, may shape the reasonable expectation of privacy for those subject to his or her authority. *See Quon*, 130 S.Ct. at 2630. Likewise, clearly communicated policies concerning the driving privilege may shape a driver's expectation of privacy in his blood should he be stopped on suspicion of DWI.

Accordingly, to the extent that mandatory draw statutes represent a lowering of the driving public's expectations concerning privacy in their blood and what they may be required to do in certain circumstances, that lowering of expectations may inform the debate concerning the extent to which the Fourth Amendment privacy right continues to require a warrant. Stated another way, the people have spoken, through their legislators, concerning their expectations about privacy, and reasonable intrusions thereon, when they are caught driving in an impaired condition.

## F. The Specific Context of a Post-Arrest Mandatory Draw.

As a practical matter, the suspect has already been arrested and cannot complain that the blood draw is interfering with his freedom; he will sit waiting either at the hospital or at the jail. He cannot complain that he is being subjected to forced surgery or medication, or some risky or painful medical procedure. He will receive the same pin prick that all patients come to expect as a routine matter of occasional testing.[6] The testing of that blood will not put his entire medical condition before the public eye, but will be limited to testing for intoxicants to confirm or deny that he was driving while intoxicated. In short, the privacy interest being invaded is slight in the context of a post-arrest mandatory draw.

## G. Statutory Protections Concerning the Manner of Drawing Blood.

Concurrent with the lack of a warrant requirement, the mandatory draw statute provides added protection concerning the procedure for the blood draw, which significantly alleviates the concerns expressed by *McNeely* and *Schmerber*.

The Supreme Court in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826 (1966), focused its concern not only on the initial justification for the blood draw, but also, arguably primarily, on the means and procedures

---

[6] Blood tests have been described as commonplace, routine, and safe by the Supreme Court. See South Dakota v. Neville, 459 U.S. 553, 563 (1983); Breithaupt v. Abram, 352 U.S. 432, 436 (1957).

employed and whether they involve "an unjustified element of personal risk of infection and pain." 384 U.S. at 772.

Assuming that the bodily invasion itself is the primary concern, that invasion can be significantly ameliorated by a statutory framework that requires the conditions of the draw to be sanitary and restricts those persons who may draw blood to a qualified few.

The blood draw provisions in the Transportation Code require both that the person drawing the blood be qualified and that it be taken in a sanitary place, as follows:

> (a) Only the following may take a blood specimen at the request or order of a peace officer under this chapter:
> (1) a physician;
> (2) a qualified technician;
> (3) a registered professional nurse;
> (4) a licensed vocational nurse; or
> (5) a licensed or certified emergency medical technician-intermediate or emergency medical technician-paramedic authorized to take a blood specimen under Subsection (c).
> (a-1) The blood specimen must be taken in a sanitary place.
> Tex. Transp. Code § 724.017.

Accordingly, blood drawn pursuant to this statutory mandate avoids the concerns present in *McNeely*, where a favorable ruling would have opened up the possible situations where blood could be drawn to any environment that the officer might consider appropriate and any person that the officer in his discretion might consider to be competent to draw it. Had

McNeely gone the other way, it is easy to imagine officers on patrol carrying a little blood draw kit, with minimal training thereon, ready to take blood wherever they encounter a drunk driver. *See Schmerber v. California*, 384 U.S. 757, 772, 86 S.Ct. 1826 (1966) (questioning the reasonableness of a blood draw "administered by police in the privacy of the stationhouse"). The Texas draw statute protects drivers against this sort of arbitrary procedure and should ease their minds concerning the circumstances of a required draw. These statutorily enhanced procedures should be considered in balancing the reasonableness of the statutory mandate against the actual intrusion allowed thereunder. In other words, to the extent that the statute lessens the dangers of a painful or unsanitary draw, it should likewise lessen the hurdle that the State must overcome in order to justify such a warrantless draw. *See Maryland v. King*, 133 S.Ct. 1958, 1969 (2013) ("fact than an intrusion is negligible is of central relevance to determining reasonableness").

## V. OTHER CASES.

There are a number of Texas cases addressing the constitutionality of the implied consent and mandatory blood-draw statute, several post-*McNeely*, although no case yet from the Court of Criminal Appeals.

- *Reeder v. State*, --- S.W.3d ----, No. 06–13–00126–CR, 2014 WL 60162 (Tex. App.--Texarkana, January 8, 2014) (recognizing

34

implied consent as another method of conducting a constitutionally valid search).

- *Aviles v. State*, 385 S.W.3d 110 (Tex. App.—San Antonio 2012, pet ref'd) (pre-*McNeely* opinion holding that the mandatory blood-draw statute does not violate the Fourth Amendment).[7]
- *Douds v. State*, --- S.W.3d ----, No. 14–12–00642–CR, 2013 WL 5629818 (Tex. App.--Houston [14th Dist.], October 15, 2013, no pet. h.) (upholding a mandatory blood draw where there were exigent circumstances).
- *State v. Villarreal*, No. 13-13-00253-CR, 2014 Tex. App. LEXIS 645, at *34 (Tex. App.—Corpus Christi Jan. 23, 2014) (holding that the statute was unconstitutional as applied because the State conceded to the trial court that there was no consent, no exigency, and no warrant).

In addition, out-of-state cases generally agree that McNeely's rejection of a categorical exigency exception to the warrant requirement does not impact implied-consent provisions. *See In re Hart*, 2013 WL 2990658, slip op. at n.2 (Wis. App., June 18, 2013) (publication decision pending) (dicta); *State v. Flonnory*, 2013 WL 3327526, at *6 (Del. Super. Ct., June 12, 2013) (not designated for publication); *see also State v. Osborne*, 2013 WL 3213298, slip op. (Wis. App., June 27, 2013) (publication decision pending).

## VI. THE UNIQUE NATURE OF THE INTRUSION – SEARCH OR SEIZURE?

Finally, the State would suggest that the Supreme Court has mislabeled a blood draw as a "search," when it more properly fits the legal

---

[7] Both the State and the defendant, however, asked the Supreme Court to grant the defendant's petition for certiorari and issue an opinion on the constitutionality of Texas' statutes in light of *McNeely*. Predictably, on January 13, 2014, the Supreme Court vacated the judgment and remanded for the state court to do such an analysis first.

definition of a "seizure." The distinction is more than merely academic, as a seizure or arrest, unlike a search, generally does not require a warrant. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 340-41, 121 S.Ct. 1536 (2001).

The Supreme Court has distinguished searches from seizures as follows: "A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property." *Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301 (1990) (citing *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652 (1984)); *see also State v. Powell*, 306 S.W.3d 761, 769 n.14 (Tex. Crim. App. 2010) (citing *Horton*).

When *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826 (1966), was decided some fifty years ago, the Supreme Court acknowledged the unique nature of the intrusion in forced blood draws and stated, "Because we are dealing with intrusions into the human body rather than with state interferences with property relationships or private papers—'houses, papers, and effects'—we write on a clean slate." 384 U.S. at 767-68. Recently, the Supreme Court has continued to recognize forced blood draws as "an invasion of bodily integrity [that] implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *Missouri v. McNeely*, 133 S.Ct. 1552, 1558 (2013). Similarly, the Supreme Court has characterized buccal

swabs of the mouth as "an invasion of 'cherished personal security' that is subject to constitutional scrutiny." *Maryland v. King*, 133 S.Ct. 1958, 1969 (2013) (quoting *Cupp v. Murphy*, 412 U.S. 291, 295, 93 S.Ct. 2000 (1973)).

However, in writing on a "clean slate," the Court has, in the State's view, too hastily categorized a blood draw as a search rather than a seizure.

In the present case, the interest being protected is, like an arrest, grounded in an individual's dominion over his own person, rather than on the privacy of things carried on his person. Blood is not a briefcase, pocket, or purse in which a person may carry private things, and it is not the private nature of the blood being seized that gives rise to the Fourth Amendment protection, but the manner of getting at that blood through an assault on the skin and veins of the person in question. Accordingly, as with an arrest, the Fourth Amendment here protects personal dominion rather than privacy.

Blood draws are comparable to the use of a taser as an incident of the defendant's arrest. *See, e.g., Carpenter v. Gage*, 686 F.3d 644, 649-50 (8th Cir. 2012); *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012); *Cook v. City of Bella Villa*, 582 F.3d 840, 849-50 (8th Cir. 2009). Both situations involve forcing a metal object under the defendant's skin – the taser being significantly more severe – and both should be analyzed as a form or manner of seizure, rather than as a search, for purposes of the Fourth Amendment.

Although the Supreme Court has summarily categorized a forced blood draw as a search, the State would argue that it should re-examine this analysis and hold that it amounts instead to a seizure - in the nature of an extension or collateral part of the arrest of the person - and that, as such, there is no warrant requirement if probable cause has already been established.

## VII. CONCLUSION.

Because *McNeely*'s holding was limited to whether the mere dissipation of alcohol in the blood constituted exigent circumstances, the United States Supreme Court has not ruled that § 724.012 of the Texas Transportation Code is unconstitutional. There is every reason to believe that one or more of the exceptions discussed above will be sufficient to sustain the constitutionality of the Texas mandatory blood draw and implied consent statutes, which are narrowly drawn to include only the most egregious offenders and situations. Additionally, the blood draw in this case meets several exceptions to the warrant requirement – actual consent and exigent circumstances.

## PRAYER

For the foregoing reasons, the State respectfully requests that the Court of Appeals order the trial court to vacate its order   granting

defendant's Motion to Suppress, and for all other relief to which the State shows itself justly entitled.

Respectfully Submitted,

/s/ *Michelle A. Putman*
_____
Michelle A. Putman
State Bar No. 24068493
Assistant District Attorney
105th Judicial District of Texas
901 Leopard, Room 206
Corpus Christi, Texas 78401
(361) 888-0410
(361) 888-0399 (fax)
michelle.putman@nuecesco.com

## RULE 9.4 (i) CERTIFICATION

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), I certify that the number of words in this brief, excluding those matters listed in Rule 9.4(i)(1), is 5,879.

/s/ *Michelle A. Putman*
_____
Michelle A. Putman

**CERTIFICATE OF SERVICE**

This is to certify that a copy of this brief was mailed this 19th day of February, 2015, to Appellee's attorney, Scott Ellison.

/s/ *Michelle A. Putman*

_____

Michelle A. Putman